Filed 5/18/21  In re S.A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.A. et al., Persons Coming Under the Juvenile Court Law. | |
| | D078500 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. J520221A-C) |
| v. | |
| J.A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

In this juvenile dependency proceeding involving his three children, J.A. (Father) appeals an order made at his six-month review hearing pursuant to Welfare and Institutions Code section 366.21, subdivision (e).[1] At that hearing, the court found, inter alia, that the reunification services provided to Father were reasonable. He contends that the San Diego County Health and Human Services Agency (Agency) unreasonably relied on ineffective referrals for services to an agency in Mexico, where he was residing, and failed to facilitate in-person visits with his daughters based on unreasonable concerns about the risks posed by the COVID-19 pandemic. We conclude that the juvenile court did not err in making its ruling and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In December 2019, the Agency petitioned the juvenile court under section 300, subdivision (b), on behalf of four-year-old S.A., two-year-old D.A., and one-month-old G.A. The Agency alleged that when G.A. was born, she tested positive for amphetamine and methamphetamine. S.R. (Mother) also tested positive at the time of birth and again weeks thereafter.[3] Father denied knowledge of Mother's drug use, leading the Agency to allege that his inability to identify whether Mother was using illegal substances undermined

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

[3]     Mother has not appealed and the details of her involvement in the proceedings *post* are not relevant to the issues raised on appeal. Accordingly, this opinion does not discuss Mother unless relevant to the issues raised by Father on appeal.

his ability to protect his children and placed them at substantial risk of serious physical harm or illness.

In the detention report, the Agency explained that after G.A. was born, she was placed in the neonatal intensive care unit due to her in utero exposure to methamphetamine. Years earlier, Mother had tested positive for methamphetamines while she was pregnant with S.A. The Agency also learned that law enforcement suspected Father of selling controlled substances while his daughters were in his care. Mother denied any history of methamphetamine use, but subsequently tested positive on multiple occasions.

Father allowed Mother near the children while she was under the influence apparently due to his stated inability to determine whether Mother was using methamphetamine. Based on Mother's drug use, Father's inability to protect the children, and the concern that Father, who tested negative for controlled substances, was selling methamphetamine, the Agency concluded there was a substantial danger to the children's health if they remained in their parent's care. The Agency recommended that the children be placed in out-of-home care while their parents addressed their protective issues.

At the detention hearing in December 2019, the juvenile court found the Agency had made a prima facie showing that the three children were persons described by section 300, subdivision (b), and ordered them detained in out-of-home care. The court gave the Agency discretion to place the girls with Father with the concurrence of minors' counsel. The court directed that services be provided and allowed for supervised visits.

In its jurisdiction/disposition report, the Agency noted that Mother and Father had both been arrested by United States Immigration and Customs Enforcement due to allegedly being unauthorized immigrants. Father was

3

detained in federal custody. The Agency noted that Father did not have access to services while in custody and his future status was unknown. In an addendum report filed in February 2020, the Agency stated that Father was still detained and all visits were prohibited due to "concerns with the flu."

Based on the initial court closures associated with the COVID-19 pandemic, the jurisdiction/disposition hearing was continued to July 2020. Before that hearing, Father was deported to Mexico and was living in Tijuana. The Agency was able to contact Father, who reported that although he was not able to reenter the United States, he had been having virtual visits with S.A. and D.A. In late April 2020, the Agency took the initial steps to initiate services for Father in Mexico. The Agency's initial case plan for Father included individual therapy and parenting education. The Agency noted that the Mexican agency that assisted in providing services to parents, known as "DIF," had been closed since March 2020 due to the pandemic and did not anticipate resuming services until late July 2020.[4] Similarly, the Mexican Consulate, which typically would arrange visits at the border, was closed until late July 2020. The Agency reported that the border was closed at that time to people attempting to cross for family visits.

At the jurisdiction and disposition hearing in July 2020, both parents attended remotely but offered no affirmative evidence. At the hearing, the Agency noted the difficulties in obtaining services for Father and acknowledged he was "doing the best he can to stay engaged." Noting the many barriers to obtaining services, the Agency told the court that "to the extent possible, the Agency will keep all of this on its radar and work with DIF to ensure father can engage in services as soon as possible." Father's

---

[4] "DIF" is an acronym for Desarrollo Integral de la Familia. (*In re N.O.* (2019) 31 Cal.App.5th 899, 903.)

4

counsel asked the court to allow unsupervised visits and to include attendance at either "NarAnon or NA group" in lieu of individual therapy.

At the conclusion of the hearing, the court sustained the allegations of the petition under section 300, subdivision (b). The court order supervised visitation with Father but gave the Agency discretion to allow unsupervised or overnight visits. The court asked "everybody [to] get creative about whether or not there might be some online services that he could complete that would mitigate the safety concern in this case" given the closure of many service providers and Father's inability to legally cross the border. The court set a review hearing in six months.

In advance of the six-month review hearing, the Agency reported that the children had been placed with their maternal grandmother and were "happy, healthy and enjoy being surrounded by family." Father was still in Mexico but had not started any services. The Agency had provided Father with a referral to DIF and a person to contact, but DIF had not been able to provide any services to Father. Father expressed that he would like to participate in services but was struggling to receive a response from DIF. Father continued to have daily virtual visits with his daughters, but visits at the border were still unavailable. Accordingly, the Agency's status report asked for more time to continue to provide reunification services. The Agency recommended that Father's reunification services continue for another six months.

In an addendum report filed in January 2021, the Agency acknowledged it was relying on DIF to provide services, but due to pandemic-related delays, it had "started considering other options." The Agency determined it was possible for Father to attend virtual parenting classes and requested a referral for Father. The Agency also referred Father to virtual

"Nar Anon" meetings. By January 2021, Father had begun parenting classes. The Agency was also attempting to obtain a home evaluation to allow visits, but DIF informed the Agency that it had cancelled all home evaluations due to the pandemic until late January. The Agency inquired about family members who could take the girls to Mexico for a visit, but the available family members expressed concern about COVID-19 exposure.

At the six-month review hearing, Father's counsel asked the court to find that the Agency failed to provide reasonable services. Counsel asserted that the Agency relied too heavily on DIF to provide services despite the evidence that DIF was closed due to the pandemic and was unable to provide any services. She further asserted that the Agency unreasonably declined to allow the children to travel to Mexico with relatives to visit Father in person. In response, the Agency acknowledged the difficulties in obtaining services and the delays caused by the pandemic, but maintained that the Agency had been diligent and maintained contact with Father. Regarding visits, the Agency asserted that its concern was centered on the risk to the children and caregivers from COVID-19 exposure when traveling for visits.

The juvenile court found that reasonable services had been provided "under the circumstances and facts of this case." The court concluded that the Agency does not fail to provide reasonable services when it "declines to offer San Diego-based services via video to a parent residing outside the United States." The court noted that participation in services was not a "huge priority" for Father because he acknowledged the children would likely be returned to Mother because he could not return to the United States. The court considered the "complications of the pandemic" to have interfered with the Agency's typical practice of relying on DIF to coordinate services with parents in Mexico, but found that Agency did make the referrals and could

6

not control DIF's failure to act. Thus, the court concluded that even though the Agency "dropped the ball" for two months by not finding a "creative solution" to providing Father with individual therapy, the Agency nevertheless made reasonable efforts to provide services "under the circumstances." Regarding visitation, the court concluded that while it appreciated Father's frustration, it did not find the Agency acted unreasonably by not providing in-person visits given the risks posed by the pandemic. The court also noted that the Agency indicated it would be providing 18 months of services in this case given the difficulties in connecting Father with services.

Accordingly, the court found that the Agency had provided reasonable services, ordered they continue, and set a 12-month review hearing. Father appealed. [5]

DISCUSSION

I

"The purpose of the California dependency system is to protect children from harm and to preserve families when safe for the child. (§ 300.2; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The focus during the reunification period is to preserve the family whenever possible. [Citation.] Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody. (§§ 366.21, 366.22; [citation].)" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 (*Tracy J.*).) Reasonable services during the

---

[5] As the Agency concedes, the order is appealable and Father's challenge to the juvenile court's reasonable services finding is cognizable on appeal. (See *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391, 1395; see also *In re A.G.* (2017) 12 Cal.App.5th 994 (*A.G.*).)

reunification period are statutorily required, though there is "no constitutional 'entitlement' to these services." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 475.)

"At each review hearing, if the child is not returned to the custody of his or her parent, the juvenile court is required to determine whether reasonable services that were designed to aid the parent in overcoming the problems that led to the initial removal and the continued custody of the child have been offered or provided to the parent . . . . (§ 366.21, subds. (e), (f).)" (*In re J.P.* (2014) 229 Cal.App.4th 108, 121.) In making its determination, the juvenile court considers the appropriateness of services offered, the extent to which the agency facilitated utilization of those services, and the extent to which the parent availed him or herself of the services provided. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).) Reunification services "should be tailored to the particular needs of the family." (*Tracy J.*, *supra*, 202 Cal.App.4th at p. 1425.) The adequacy of the plan and the Agency's efforts must be judged according to the circumstances of the particular case. (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.)

The Legislature has recognized that parents may be deported, but a parent's removal from the country does not preclude the provision of reunification services during a dependency proceeding. (*A.G.*, *supra*, 12 Cal.App.5th at p. 1003.) If a parent has been deported to the parent's country of origin, the court may still provide reunification services and when determining the content of those services, "the court shall consider the

8

particular barriers to a[ ] . . . deported parent's access to those court-mandated services and ability to maintain contact with the child, and shall document this information in the child's case plan." (§ 361.5, subd. (e)(1).) The Agency must make "[r]easonable efforts to assist parents who have been deported to contact child welfare authorities in their country of origin, to identify any available services that would substantially comply with case plan requirements, to document the parents' participation in those services, and to accept reports from local child welfare authorities as to the parents' living situation, progress, and participation in services." (*Id.* at subd. (e)(1)(E).)

We review a reasonable services finding for substantial evidence.[6] (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.) "In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*Misako R.*, *supra*, 2 Cal.App.4th at p. 545; see also *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)

Viewing the evidence in the light most favorable to the juvenile court's ruling, as we must, we conclude the finding of reasonableness is supported by substantial evidence and that the court did not err in finding the Agency

_____

[6] Father contends that we must adjust our analysis to reflect the higher burden of proof placed on the juvenile court to find clear and convincing evidence to support its finding that the services were reasonable. The Agency disagrees, asserting that although the juvenile court expressed it was applying the clear and convincing evidence standard, it was only legally required to apply the preponderance of the evidence burden of proof. Under either standard, however, our conclusion that the trial court's reasonable services finding is supported by substantial evidence would be the same.

provided reasonable services. "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . .' " (*A.G.*, *supra*, 12 Cal.App.5th at p. 1001.)

Father does not contend that the Agency failed to identify the problems leading to the loss of custody. The Agency determined that Father's inability to safeguard the children when Mother was under the influence placed them at substantial risk. Similarly, Father does not challenge the Agency's determination that to remedy this problem, Father should receive parenting classes and individual therapy.[7]

At most, Father challenges the adequacy of the Agency's facilitation of visitation, which was entirely virtual during the six-month review period. Earlier in the reunification period, the Agency cited the closure of the Mexican Consulate, border restrictions, and the children's lack of passports as the reasons why Father did not have in-person visits. By the time of the six-month review hearing, the Agency focused solely on the risk to the children of COVID-19 exposure associated with a trip in a car with relatives

---

[7]    As the Agency concedes, despite a social worker's mistaken belief that Father was subject to drug testing, his case plan did not involve any drug testing. Early in the proceeding, Father tested negative for controlled substances and, despite a suggestion he may have sold methamphetamine, there was no indication that the Agency was concerned about Father's possible drug use.

across the border.[8] The court acknowledged that it appreciated Father's frustration with the lack of in-person visits, but noted "it's a frustration shared by many, many people who have not seen their children, or seen their parents or their grandparents for a year."

Father suggests that the Agency did not provide reasonable services "because it failed to provide any visitation." However, the record demonstrates that Father has daily virtual video visits with his children. Although virtual visits are certainly less than ideal, Father offers no authority to support the position that visitation *must* be in person or that video or voice visits are, as a matter of law, inadequate.[9] Especially in light of the risk to the children posed by the COVID-19 pandemic, we cannot conclude that the Agency acted unreasonably in restricting cross-border travel to facilitate in-person visits. While visitation is a critical element of the reunification process, "[n]o visitation order shall jeopardize the safety of the children." (§ 362.1, subd. (a)(1)(B).) In the absence of evidence to the contrary, we conclude that, in the limited circumstances presented in this

---

[8] Despite Father's suggestions to the contrary on appeal , neither the Agency nor the juvenile court were focused *only* on the risk posed by exposure to Father. Instead, the court primarily expressed concern with the exposure that would arise during the cross-border journey to Father.

[9] At most, Father relies on Emergency Rules of Court, rule 6(c)(7), which prohibits a suspension of visitation *solely* because of the COVID-19 pandemic, but rather requires the Agency and the court to "balance the public health directives and best interest of the child, and take into consideration whether in-person visitation may continue to be held safely." Here, the court considered the unique circumstances of this case, which would have required the children to travel in an automobile with relatives they did not normally reside with to cross the border to visit Father at an unknown location.

11

case, the Agency acted reasonably when it was only able to provide virtual visits rather than cross-border in-person visits with Father.[10]

For the remainder of his case plan, consisting of parenting classes and individual therapy, Father's focus on appeal is not the adequacy of the case plan, but rather whether the Agency " 'maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . .' " (*A.G.*, *supra*, 12 Cal.App.5th at p. 1001.) Our review of the record supports the conclusion that the juvenile court's finding of reasonableness is supported by substantial evidence.[11]

As Father notes, "[t]ime is always of the essence in dependency proceedings, especially when children younger than three are involved." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1242.) At least one court has concluded that significant delays caused by placing parents on waitlists of six months to a year without seeking alternatives is a sufficient ground for finding that reasonable services were not provided. (*Id.* at pp. 1242-1244.) Delays in locating service providers and providing contact information to the parents for those provides may similarly preclude a finding that reasonable services were provided. (*In re T.W.-1* (2017) 9 Cal.App.5th 339, 346.) However, when a parent is located out of California, the ability to provide services often becomes more difficult and any delays caused by the parent's

---

[10] On appeal, Father cites an online article regarding family visitation during the COVID-19 pandemic. The record does not reflect that the juvenile court considered the article and Father makes an inadequate showing that it is a matter appropriate for judicial notice. We therefore decline to consider the article on appeal.

[11] The Agency asserts, based on a cursory argument, that Father forfeited his challenge of the reasonableness of the case plan. We disagree.

location should be considered within the context of the unique circumstances of each case when considering the reasonableness of the Agency's actions. (See, e.g., *id.* at p. 348.)

Here, although the Agency's attempts to connect Father with services were beset with delays caused by his location in Mexico and the COVID-19 pandemic, the Agency continued to maintain contact and worked to find services providers. With regard to parenting classes, the Agency immediately began looking for services in Mexico following Father's deportation in April 2020. At that time, Father did not have a computer, making it difficult for him to attend any virtual classes. The Agency intended to follow its typical procedure of coordinating services with DIF, the Mexican agency. At that time, DIF was closed and did not plan to resume services until July 22, 2020. When DIF did not reopen as planned, the Agency contacted Father in early August and again in September, when Father appears to have expressed a willingness to attend online classes. The Agency continued to contact both Father and DIF throughout 2020 in an attempt to coordinate services. By December 2020, the Agency had shifted its focus and, instead of relying on DIF, the social worker arranged virtual classes for Father with a San Diego provider. By the time of the six-month review hearing, Father had begun participating in those classes. Although the arduous path to locate a service provider was less than ideal, the evidence establishes that the Agency's actions were reasonable under the circumstances.

Similarly, the evidence demonstrates that the Agency remained in contact with Father regarding individual therapy services. By July 2020, the Agency again noted the delays caused by the closure of DIF, but assured the court it would continue to work with DIF "to ensure the father can engage in services as soon as possible." Father's counsel acknowledged the difficulty in

scheduling services with DIF and suggested the court allow Father to participate in "NarAnon or NA" in lieu of therapy. Over the next several months, the Agency maintained contact with Father and continued to attempt to arrange therapy services, either through DIF or a provider in the United States. After these attempts were unsuccessful, the court ordered the Agency to assist Father "in connecting . . . with Al-Anon or Nar-Anon that can be done virtually, that's free." Following that order, the Agency sent Father information about Nar-Anon, which provides a program for family and friends of an addicted person. Father, however, did not enroll in Nar-Anon by the time of the six-month review hearing. While the Agency may have "dropped the ball" at some point, as the juvenile court found, it ultimately was able to provide Father with contact information for Nar-Anon meetings, which the court suggested would be helpful in demonstrating Father was addressing the issues identified in his case plan. The record reflects that the Agency maintained contact and continued assisting Father in obtaining therapy services. Given the circumstances, the juvenile court correctly concluded that the Agency acted reasonably despite the delays.

Father compares this case to *A.G.*, *supra*, 12 Cal.App.5th 994, which similarly involved a challenge on appeal to the juvenile court's finding that reasonable services were provided to a father deported to Mexico. (*Id.* at pp. 997-998.) In *A.G.*, after the Agency arranged for services through DIF, the father initially indicated he was no longer interested in reunification services, but then changed his mind again to request services. (*Id.* at pp. 998-999.) After several delays in obtaining services, the Agency recommended returning the children to the mother's care at the 12-month review hearing and suggested it would provide discretionary services to father. (*Id.* at

14

pp. 999-1000.) The juvenile court found the Agency had offered reasonable services, despite father's inability to begin services, and placed the blame on father for being deported and then refusing services. (*Id*. at p. 1000.) On appeal, this court reversed, holding that the juvenile court's finding that father declined services was not supported by substantial evidence and the conclusion that father was responsible for the Agency's failure to provide services because he was deported was "legally indefensible." (*Id*. at p. 1002.)

*A.G.* is inapposite. Here, the juvenile court did not blame Father for his deportation and recognized that Father had steadfastly expressed an interest in receiving reunification services, even if Father had suggested that Mother would be primarily responsible for engaging in services. Unlike the Agency's actions in *A.G.*, the Agency here continued to engage with Father to find service providers despite the difficulties presented by Father being in Mexico. Our conclusion that the juvenile court correctly found the Agency provided reasonable services is predicated on the Agency's response to these difficulties, which demonstrate that the Agency was committed to providing Father with services during the reunification period. Unlike the juvenile court in *A.G.*, the court below did not attempt to rely upon a "Go to Mexico, lose your child" rule. (*A.G.*, *supra*, 12 Cal.App.5th at p. 1003.) Instead, the court recognized the barriers to providing services and asked the Agency to be "get creative" in finding alternatives. Given these differences, the decision in *A.G.* provides little guidance beyond reflecting that the provision of family reunification services in Mexico by DIF can often involve delays. The Agency appears to be well aware of these issues and committed to connecting Father with services.

When considering the reasonableness of the services provided by the Agency, we must consider the Agency's actions in the context of the specific circumstances presented in each case. (*Misako R.*, supra, 2 Cal.App.4th at p. 547.) Here, those unique circumstances involved a parent in Mexico who could not legally cross the border combined with the COVID-19 pandemic, which forced the closure of service providers and precluded cross-border visitation due to the concomitant health risk to the children. Applying the appropriate deferential standard of review, we conclude substantial evidence supports the juvenile court's determination that the Agency provided reasonable services to Father in the context of the difficult circumstances present in this proceeding.

DISPOSITION

The order is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

16